There is United States v. McQueary, No. 23-5087. If it please the Court, Stephanie Baker, appearing on behalf of the appellant, Mr. McQueary. Apologies. I apologize. Thank you for indicating I need to speak up. Okay. So the case here, Mr. McQueary was convicted of assault with a deadly weapon for driving his car in the direction of two security guards. In its closing argument, when arguing that this, the failure to give a requested adverse inference jury instruction, the government- Does that generally apply when the government has the documents as opposed to a separate entity? It is. It is. However, I maintain that in this case, an agency relationship was established between the government through the police and the hospital that maintained and preserved the evidence. And how? I didn't see that in the facts at all. That would be up to you to prove and I didn't see that that was the basis whatsoever for your arguments before the district court in favor of the instructions. In fact, when counsel went through the evidence in support of the instruction, everything that was said had to do with St. Francis and that it had the videos, that it maintained the videos, that it selected the videos, that it manipulated the videos, and I mean there was just nothing that would support a factual determination of agency. I would point to the testimony of the officers Yang and Slater. Their testimony showed that they were assigned, well, Officer Yang in particular, but Officer retrieved the surveillance video on that day when they responded to the call at the hospital. It was his objective to retrieve that evidence and he stated that he, or rather Slater, indicated that the reason for getting that evidence was specifically to determine if a crime had been committed that day. During that interaction and through their testimony, it's apparent that they are interacting with the guards, learning their capacities to manipulate and preserve, and at the end of this, it's actually a rather protracted video, but I appreciate that that's not before the court, but their testimony makes clear that after learning all of their abilities and that actually witnessing the fact that the guards who fired on Mr. McQueary were the ones who were capturing the video, which turned out to actually be the case, they delegated their responsibility and their objective to retrieve that evidence. So you're suggesting that the government delegated a duty they didn't have basically, which was to investigate? Not investigate. Well, what was it? It was to preserve evidence, and the police were on notice that this was evidence. They knew that this was evidence of the events that day, and the government knew that was evidence of the events that day. Can you point to a single case where there's been a spoliation instruction based on what you're referring to as agency here and any kind of similar facts? Well, that is part of the problem because there hasn't been similar facts where the relationship or the dealings between the government and its investigators and the third party was so protracted and so obvious. The Hernandez case that we cited in our brief, it talks about the role of agency when someone's constitutional, and we're raising due process violation here, when agency can be a basis for holding the government responsible for a third party's actions when that third party's actions are within the scope of that relationship. But Fernandez didn't ultimately find a principal agent relationship, and so you're relying on these interactions. At the same time, I'm wondering what's the standard for the principal agency relationship that you're contending existed? Where do we go for guidance? Certainly. The interactions would be your factual predicate for it, but what's the applicable law? What do we look to? Is it Fernandez? Does Fernandez really give us any guidance on this? It looks to be, I think Fernandez gives us the best guidance that there is, as it talks about how the role of agency is implicated and can hold the government responsible. Specifically, it talks about in the Fourth Amendment context where the government can be held responsible if it coerces another party to asking questions. We don't have that here. We don't have that here. What we have here, though, is unlike in Hernandez, where you had a third party who was in possession of the video that the defendant sought to have preserved, in that case, the government had absolutely no interactions whatsoever with the Greyhound bus station about the preservation of that video. Here, all the interactions are clearly about preservation of the video. Everybody knew that that's what their objective was, and that was the goal of that agreement between the police and the hospital that day and the safeguards. I'm quite sure we specifically said in Hernandez that interaction and communication alone between a third party and the police officers in that case and in this case is simply not enough. It doesn't create an agency relationship. That just doesn't do it. Again, that's all we've got here, interaction. I disagree. I think you've got testimony regarding how the police officers actually did instruct them, yes, we need that video, and the guard said, oh, yeah, I'm going to get this one for you. I mean, there's a whole back and forth. The security guard supervisor, Mr. Hart, gives more background to that. We have not just a, hey, can you get that to us? We have an ongoing discussion, and the government, I mean, when the... Well, counsel, it wasn't just, hey, can you give it to us? The response was no. Our senior counsel has to make that decision, right? No, it wasn't no. It was, yeah, we'll give that to you. It wasn't yes. They didn't give it to them at the time. Not immediately, but they did give it to it, and when they did give it to them... And what does that have to do with an agent-principal relationship? They asked for it, they said the counsel has to review it, and then they turned it over. Well, at that point, I mean, the police knew that they would be going through those processes, just like the police knew that they would be manipulating these videos. They showed the way they were manipulating these videos while they were in their security office. So I think that that actually speaks to the fact that the police was fully aware of who and what they were going to get when they delegated this. Were they aware of the hospital's protocols for retention and destruction? Did they know about the 29 or 30 days? I do not have evidence of that. That is correct. Well, even assuming that there was a connection there, what is the evidence of bad faith? The delegation of this crucial... What? I'm sorry? The delegation of collecting this crucial evidence that the police knew was crucial to any resulting prosecution. Well, assuming they knew it, I mean, I don't think it was exculpatory either, but assuming it was, what is the bad faith of the government? There's no evidence whatsoever of any bad faith. They turned over what they had when they had it. Okay. Well, I would say that in this case, because of the situation, because this is in the Northern District of Oklahoma, this case took place in the Northern District of Oklahoma. And since McGirt, every time the Tulsa police responds to a call, there's a high likelihood that it will be a federal case. So I think that the police were operating as the government's agents in their... When they conducted their... Well, but where is the bad faith? The bad faith is in entrusting, delegating their collection of critical evidence. Pardon me? That's a little obtuse. I mean, you've now said that bad faith is any time the police show up in a McGirt situation. No, sir. I... Sorry that I missed... Made you think that that was what I'm saying. Here where the police's actions can be imputed to the government, that is what I'm trying to say, because of the situation with McGirt and the dual role that police often play in federal prosecutions. Okay. So where's the bad faith here? The bad faith, again, is entrusting the collection of this evidence to this third party that wasn't just a third party. The third party owned the evidence. They did. They did. Okay. And they turned over what they were asked to turn over after they had done whatever they were going to do with it. So where is the bad faith on the government's part? Entrusting the selection of this evidence to a third party, who's not only a third party- Well, it was third party's evidence. It was their cameras, it was their film, and they had it. Now where is the bad faith of the government? The government failed to preserve the evidence of all, the entire evidence of the events that day. Well, did they ask? Did they ask the hospital to preserve the evidence? The, they did ask, after they received what they got from, well, actually, I take that back. I believe the agent's, the federal agent's testimony is that he went to the hospital shortly after the events and asked for the video and he received the video. So they didn't ask for any others after they reviewed it. And that's bad faith? I believe so. Because the video itself was obviously altered.  Pull their gun out and say, no, I want you to give me that right now. No, but they can certainly issue a subpoena. If they're truly investigating and trying to preserve this evidence, I think they can do a good faith investigation instead of just taking the word of two, of guards who fired their weapons at Mr. McQueary. Well, maybe they could have done more. Maybe they could have asked about their retention policy. Maybe they could have issued a subpoena. But the fact that they could have done more, how does that equate to bad faith? I think it's because of who they entrusted this to. They did rely on this evidence. I believe they also cited to this evidence in the grand jury, in the complaint. It was central to the case. You're talking about missing. You're talking about evidence that was destroyed after the 29 or 30 days, correct?  Do we even know from the record whether any evidence was in fact destroyed? That was the testimony of the, I believe, the supervising security guard Hart. That they didn't receive. All right. Don't you also have to show for a Trumpetta violation that any missing evidence was apparently exculpatory? I would say under these circumstances, the surveillance video, the raw surveillance video, the unedited surveillance video, was apparently exculpatory. You have the two competing self-defense claims, and the videos that were produced are the best evidence that there was apparently exculpatory evidence. Because the first video provided is the video of the lobby. There's no time stamps on that, and there's no way to track how fast anything's going, and it's a wide view. You can see the frame. There's obviously no manipulation being done. The other two videos that are the only videos that were produced that show the most critical instance, events of this case, were obviously edited and manipulated. They lacked the frame. They had been, part of the view is obstructed. You cannot see the most critical part of this entire event, which is when the guards say Mr. McQueary aimed his vehicle at them. All you can see is them raising their firearms. How do you know there was a camera that showed more of the event? Because they had 900 cameras on that camera. But that was for the whole facility. There was no, I appreciate that there was no development of that issue. Thank you counsel. Thank you. May it please the court, Thomas Duncombe for the United States. There was no trombetta violation in this case because there was no evidence that was missing that had an apparent exculpatory value, and there was no young blood violation in this case because there was no evidence of bad faith. Both of those, apparent exculpatory value and bad faith, are issues that this court reviews for clear error. The district court made findings as to both based on the record, based on not just the pretrial filings but also the entire trial evidence, and found as a matter of fact that there was no bad faith and that there was no apparent exculpatory value. Could this appeal be resolved without having to address this agency principle issue? Yes, because this court, without even referring to agency, could, for example, say even assuming that the hospital was an agency of the government, there's no evidence that the hospital acted in bad faith. And we contend based on the case law, the hospital's bad faith or good faith is irrelevant because the officers and the special agents with the ATF were the government in this case, not the hospital. But this court could nevertheless find that there was no bad faith on the part of the hospital. And there certainly wasn't any reason for the officers to be worried about any bad faith of the hospital when they arrived at the hospital and examined the evidence. It's useful, I think, to go through the evidence that the officers encountered when they got to the scene. First of all, the post-incident behavior of the two parties in this case, the security officers on the one hand and Mr. McQuarrie on the other hand, could not have been more different. Mr. McQuarrie fled the scene, he concealed where he had just been from an officer who was just being a good Samaritan and picked him up. He abandoned his car. Meanwhile, the security guards immediately called the police and said, please come to the scene. We have just fired our weapons. As the appellant indicated in its brief, there's no dispute here that the officers fired their weapons. They collected witness statements, the officers did, and the statements by the three security officers, including Officer Young, were entirely consistent with the statements that they got from the disinterested bystanders in the parking lot. Mr. O'Neill said it looked like the car tried to run the officer over. Ms. Case, Mr. O'Neill's girlfriend, said that she did hear a gunshot, but only after she saw the car accelerating toward the officers at a high rate of speed. The security at the hospital was cooperative with the police in letting them come to the There was no reason, in short, for the officers to suspect that it would be a problem in this particular case to let the party that owned the evidence continue to control the evidence as the case progressed and get the portions of the evidence that the officers needed for them. Did they have any choice? Did the officers have a choice? Yeah. I mean, the hospital said, oh, you're not going to look at it until our general counsel checks it over. So every police department has options at his disposal, and the government certainly has options at its disposal, such as search warrants, such as subpoenas. But I would say, making a medical analogy, if your case calls for a scalpel, you don't have to use a bone saw just because you have it. So the government certainly could have done a search warrant and disrupted the hospital's operations for a day or several days, while the government brought in its own agents to examine the surveillance footage itself, figured out for itself which of the 900 videos it wanted footage of. So by that time, though, the general counsel would already have looked at the tape, and they would have given it then over to the police, wouldn't they? Presumably, yes. And again, this is something that, although the officers, Yang and Slater, who both, from the record, appear to have been very junior officers, I think Officer Yang said he had been on the force for a year and eight months at the time of the trial, they said, well, it's a little unusual for a witness or a victim to tell us, no, we're not going to give you evidence. But I would submit that, especially in a federal investigation, it's quite common when you have an institutional victim or an institutional witness or a witness or a victim who is a cooperating witness or victim who is themselves charged, which was not the case here. But it's quite common to deal with the counsel of a witness or a victim. And it's quite common further to go through the counsel when making requests for evidence. It's easier for the government. It makes the relationship, the arm's length transaction, go more smoothly. The hospital is comfortable that they're going through the procedures they need to go through. The employees are comfortable. And it doesn't disrupt operations in the way a demand for, you know, stop what you're doing and give us these 10 items might. So, again, there was a question during my colleague's presentation about what is the standard for agency in this area of law? Could I just ask you this question? The appellant has made arguments about missing video, but also manipulation. Can you address the manipulation argument? Sure. So the manipulation from how the district court understood the arguments that the defense was making was that there were some of the videos that didn't have timestamps in them. And there was testimony that was uncontradicted at the trial from Matt Hart, the security manager, who said, well, we have this software called Snagit, which when you're trying to get an excerpt of a video, sometimes that causes problems or creates a different format. It's also important to remember that one of the three video clips was very obviously manipulated and cropped by design because it was designed to provide a close-up view of the moment just before potential impact with the car. So the fact that there wasn't a timestamp, the fact that there wasn't the word playback in the upper right-hand corner, there's nothing other than speculation or innuendo to indicate that there was something untoward with regard to what the hospital did with its videos. But, again, whether the hospital acted in good or bad faith in this case is irrelevant because there was no agency relationship. And this court in Fernandez specifically said it has to be more for this context than simply a common law agency relationship. You have to show that not only was the hospital an agent of the government, the hospital was an agent for this particular purpose, for the purpose of how it would preserve and when it would allow videos to be destroyed. And there simply was no evidence of that in this case. There was no evidence that the officers or anyone from the government knew what the hospital's preservation policies were, and it didn't come up as an issue until January 30th, a few weeks before the trial, when the defense said, we view the videos as exculpatory. And within four hours of receiving that email, the government jumped into action and called the hospital and said, do you have any more videos, and found out that the hospital did not. Does the government even have a duty or an obligation to investigate or collect evidence? And I want to be careful the way I phrase this, because in the abstract or with regard to the public at large, there is a duty to do their jobs professionally. There's certainly a duty to their employer. There's a duty to the executive branch. You know, if they're federal officers, to investigate in general. The real question where the rubber meets the road in these cases is, is there an undifferentiated duty to investigate vis-a-vis the defendant's due process rights? And the answer to that is no. There is no duty on the part of the officers to say, well, you know, if we get more videos, we might find evidence that's favorable to the defense. If the case law is very clear, if they see something or find something that is exculpatory, they must turn that over and they must seek to preserve it. And so that's the point of Trombetta. But there was nothing apparently exculpatory here. And the last thing that I'll point out is, as this court observed in cases like Hood and Pearl, there was an ample opportunity in this case for the defense to offer up its theory of what happened with the videos to the jury. And it was even more ample than the opportunity that the defendants in Hood and Pearl had, because in opening statement, in closing argument, in cross-examinations, in the witnesses that the defendant called, who were almost all from the hospital, the defense was able to focus the jury's attention on what they believed that had happened in this case, which is the hospital is concealing evidence. The hospital is trying to screw this dude over, as the defense put it in its closing argument. And they were able to present that amply to the jury. So could I just ask you on this principal agent issue, I think I heard you say a few minutes ago that in Fernandez there was discussion of common law, principal agent, but when there's a due process claim, showing may even have to be more than that, but at least common law, principal agent. If that's the starting point, where do we go to find the common law we would apply to this situation? I think it would be the same place that Fernandez went, which is to cases describing agency and what makes someone an agent, and then applying that to the- I was wondering if maybe you took that to another level, and had even more guidance than Fernandez. Unfortunately, no, but I will point out that just as in Fernandez here, there was no need really to delve that deeply into agency law, because there wasn't really even a fact or facts that brought this particularly close to the line of agency. And I'll point out a counterexample for the use that it might have, which is Beckstead. In Beckstead, even though, which I think was a 2007 case, even though this court found ultimately there was no evidence of bad faith, the company that was cleaning the crime scene was a company that was contracted by the police department in that case, and was specifically acting only at the instruction of the police department. That was the finding in Beckstead, and it's in footnote three in that case. So that's the kind of relationship that we would expect to see if we're going to impute, for due process purposes, the hospital's actions to the government. For example, they tell the hospital, you are now going to retain these videos for a certain period of time, and we have an agreement from you to do that. Or, because Fernandez talks about agency for the purposes of the destruction of the evidence, it would have to be, hey, hospital, after 30 days, thou shall destroy these videos. So that certainly wasn't the case here, but even beyond that, there was nothing suggesting that TPD or ATF execute or exercise any sort of discretionary authority over what the hospital did with its videos. In Fernandez, there was actually a fairly detailed evidentiary hearing on the issue of agency. So when it came up on appeal, we had a pretty solid record, evidentiary record, as did the district court, obviously. Here, I didn't get the impression that anybody was even thinking about agency until maybe the motion for the spoliation instruction was argued, and then I think the government brought up that there's a threshold issue here of the government not having possession. So my sense was that that wasn't even part of anyone's thought process as the evidence was coming on, so it didn't really come on in a way that we can use it at this point. Well, so a couple of remarks based on that observation. I agree there wasn't much development of the agency question, although, as Your Honors pointed out, the government attorney certainly was on the ball with that issue, and so was the court. The court said this was not the government destroying evidence. That's what Bohl and Smith talk about when they talk about was their bad faith in destruction of the evidence. As a threshold matter, it's inherent that there has to be government destruction, and if the third party does it, you've got to be able to impute it to the government and say, well, that actually, piercing through some veil, that really was the government acting through a medium. For all those reasons, unless there are any further questions. Well, counsel, you agree that the government agrees that restitution was improper here? Yes, we concede that issue. I just wanted to get that in my notes. Yes. Thank you. Thank you, counsel. I think we have exhausted time. The case will be submitted and counsel are excused. Thank you for the opportunity.